UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**UNITED STATES OF AMERICA**,
        Plaintiff,

v.

**WARNER CRIDER**,
        Defendant.

Case No.  01-CR-81028-01

Hon.  Arthur J. Tarnow

**BRIEF IN SUPPORT OF MOTION TO REDUCE SENTENCE
PURSUANT TO 18 USC 3582(c)(1)(A)(I)**

### Introduction

Defendant Warner Crider was convicted of by jury of multiple counts and initially sentenced to life.  On April 16, 2016, the Court reduced Crider's life sentences to terms of 360 months.

On April 16, 2019, Crider filed a *pro se* Motion for imposition of a reduced sentence pursuant to the First Step Act.  The Court granted the motion, conducted a resentencing, and on December 12, 2019, sentenced Crider to 268 months as to Counts 1 and 3, 60 months as to Count 6, and 120 months as to Count 7, to run concurrent to one another.  According to the BOP website, his release date is March 4, 2021.

The government filed a notice of appeal, but later voluntarily dismissed the appeal.

Defendant requests the Court reduce his sentence under 18 USC 3582(c)(1)(A), which was amended by the First Step Act. That amendment expanded the discretionary authority of the Court to modify a sentence for "extraordinary and compelling reasons."

Defendant sent the Court a letter requesting the appointment of counsel for the purpose of preparing a motion for "compassionate release" under 18 USC 3582(c)(1)(A), which was amended by the First Step Act to expand the discretionary authority of the Court to modify a sentence for "extraordinary and compelling reasons." The Court appointed counsel and set a briefing schedule. The government filed its Response on July 17, 2020.

## EXHAUSTION

A sentence reduction under this provision requires exhaustion. When a defendant moves for release, a court may not act on the motion unless it was filed after filing a request with the warden to initiate such a motion or waiting 30 days from when the warden received the request. *United States v. Alam*, __ F. 3d __ (Sixth Circuit Docket No. 20-1298, decided June 2, 2020.)

Crider sent a letter to the warden on April 6, 2020. Exhibit 1. The letter requested placement in home confinement. This is understandable. In the experience of the undersigned, at the time the letter was sent, many prisoners used the terms

"home confinement" and "compassionate release" interchangeably, not understanding the technical difference, perhaps due to the fact that numerous orders granting compassionate release contained a home confinement condition of supervised release.

Efforts undertaken by prisoners acting *pro se* are held to less stringent standards than formal pleadings drafted by lawyers. *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Castro v. United States*, 540 U.S. 375 (2003). Defendant requests that the Court construe his letter as satisfying the exhaustion requirement.

**BOP Efforts to Contain COVID-19 Have Been Unsuccessful.**

Since late June, there has been a dramatic increase in the number of infections within BOP. On June 25, the number of currently positive-testing inmates had declined to 1,249 and it appeared the downward trend might continue. Now, with the pandemic sweeping across the country, the number of infections has risen to 4096, far surpassing the previous peak in May, 2020, with no sign of abating.

Seagoville, one of the few BOP institutions undergoing full testing, now reports 949 infected inmates - more than half its population of 1816 - suggesting that the BOP infection rate system-wide is probably far greater than reported. BOP has completed tests of just over 30,000 inmates of a total inmate population exceeding 143,000, and of those tested, about 29% have been positive.

In a recent dissent, Sixth Circuit Chief Judge Cole described BOP efforts to control the virus. *Wilson v. Williams*, _ F.3d __ (6th Cir. Docket No. 20-3447, decided June 9, 2020). Judge Cole observed that BOP's "plan" to safeguard prisoners does not measure up to its hype:

> The BOP casts its overall response to COVID-19 as a "multiphase action plan." *See* BOP Br. at 4. That phrase sounds good on paper; it conveys the message that the BOP is doing all that it possibly can to address the outbreak at Elkton. But it means little until we look behind the curtain and examine whether the plan's phases move the BOP closer to keeping the inmates safe. Such an examination here reveals that the BOP's six-phase plan to address COVID-19 is far less impressive than its title suggests. ***That plan consists of two different phases addressing the screening of inmates, an entire phase consisting of only taking inventory of the BOP's cleaning supplies, a phase where the BOP confined inmates to their quarters where they cannot socially distance, and a final phase that just extended the previous one***. (R. 10-1, PageID 174–78.) It turns out, then, that the "six-phase" plan is, for practical purposes, a four-phase plan where one phase is taking inventory of supplies and another involves the locking of inmates in 150-person clusters where they cannot access the principal method of COVID-19 prevention [distancing]. Suffice to say, with stakes this high, the specifics matter far more than the headline.

A recent article in the Journal of the American Medical Association concluded that the rate of infection and bad outcomes has been far worse for prisoners than for the general population. "The COVID-19 case rate for prisoners was 5.5 times higher than the U.S. population case rate of 587 per 100,000," and "[t]he crude COVID-19 death rate in prisons was 39 deaths per 100,000 prisoners, which was higher than the U.S. population rate of 29 deaths per 100,000." Exhibit 2.

In the statistics on its website, BOP reports numerous inmates recovered. However, as counsel is informed and believes, the BOP interpretation of "recovery" is when an inmate no longer tests positive. Another recent article in the Journal of the American Medical Association, entitled "Persistent Symptoms in Patients After Acute COVD-19," based upon a study of 143 Italian patients, reflected that the vast majority of patients experienced continuing symptoms and worsened quality of life after release. Exhibit 3.

The BOP data does not describe whether inmates considered "recovered" have ongoing symptoms nor their seriousness. Multiple recent news stories have reported findings similar to the Italian study: COVID-19 is not a simple respiratory illness. It attacks multiple body systems and inflicts serious continuing and potentially permanent damage in a significant number of patients, though there is as yet little data regarding in how high a percentage of patients that occurs.

**The Court Has Jurisdiction to Reduce the Sentence.**

The changes to 18 U.S.C. § 3582(C)(1)(A)(i) made by the First Step Act provide the Court with the authority to decide whether extraordinary and compelling circumstances warrant a sentence reduction. A court can now reduce a sentence for extraordinary and compelling reasons upon motion of the defendant if the BOP declines.

Prior to the First Step Act, Congress delegated to the Sentencing Commission and the BOP what criteria justified so-called "compassionate release" for "extraordinary and compelling reasons." The First Step Act changed that, and now permits prisoners the ability to file motions with the court if BOP declines to do so. Congress' clear intention was to eliminate BOP's solitary role as a gatekeeper.

Defendant maintains that an "extraordinary and compelling" reason which is not listed in Application Note 1(D) to USSG 1B1.13 can now be found by a court, because the subdelegation to the BOP in that Note can be disregarded in light of the First Step Act's removal of BOP as gatekeeper.

In *United States v. Brown*, __ F.Supp. 3d __ (SD IA, Docket No. 4:05-00227-1, April 29, 2020), the Court granted release to a model prisoner serving a 510 month sentence. The Court noted that Congress never defined what constitutes "extraordinary and compelling" reasons, and initially delegated that to the Commission, which subdelegated definitions to the BOP. Congress and the Commission provided only two guideposts, that the circumstances need not have been unforeseen at sentencing, and rehabilitation alone is not *by itself* a reason. But without an amendment to the guideline to account for the changes in the First Step Act, the Court concluded that courts now have discretion in determining the reasons:

> Courts otherwise are left to themselves because the Commission, for whatever reason, never updated its policy statement, as statutorily

6

required, for the First Step Act. Rather, the outdated policy statement still assumes compassionate release "may be granted only upon motion by the Director of the Bureau of Prisons." § 1 B 1. I 3 cmt. n.4. This left district courts in a conundrum. On the one hand, Congress unequivocally said it wishes to "[i]ncreas[e] the [u]se ... of [c]ompassionate [r]e1ease" by allowing district courts to grant petitions "consistent with *applicable* policy statements" from the Commission. § 3582( c)(l )( A) (emphasis added). On the other hand, the Commission - unable to take any official action - has not made the policy statement for the old regime applicable to the new one.

Many courts, including this one, have concluded this means the Commission lacks an applicable policy statement regarding when a court can grant compassionate release. *United States v. Havnes*, No. 93 CR 1043,2020 WL 1941478. at * 14 (E.D.N.Y. Apr. 22, 2020) (citing thirteen such cases); *Brown.* 411 F. Supp. 3d at 450. In the absence of an applicable policy statement, these courts conclude "the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1 B 1.13 cmt. n.1(A) - (C) warrant granting relief." *Cantu,* 423 F. Supp.3d at 352; see also *United States v. Fox,* No.2: 14-CR-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) (treating "the previous BOP discretion to identify other extraordinary and compelling reasons as assigned now to the courts"). (Slip opinion at p. 7.)

The Court reasoned that Congress had authority to revoke or amend the Sentencing Guidelines at any time, and Congress was aware how rarely the BOP granted release and intended to increase its use. Therefore, the Court found that a district court assumes the same discretion as the BOP when considering a compassionate release motion, and deference to the BOP no longer made sense after the First Step Act reduced the BOP role and enabled the courts to act. *Id*. at p. 8.

The Court's authority to reduce Crider's sentence is not only consistent with the

statute, but also with other portions of the language in the policy statement, which makes clear that "[t]he court is in a unique position to determine whether the circumstances warrant a reduction (and, if so, the amount of reduction)" and encourages the filing of a motion for compassionate release where a defendant "meets any of the circumstances set forth in [the] Application Note." *Brown*, *supra*, 2019 WL 4942051, at *4 (observing the courts' role in "[r]eleasing defendants from incarceration is a delicate business—although not any more so than incarcerating them initially.").

This Court may make an independent assessment of Crider's case in considering whether extraordinary and compelling reasons warrant the reduction of his sentence.

### Extraordinary and Compelling Circumstances Warrant a Reduction in Smith's Sentence.

When deciding a motion for relief under 18 U.S.C. § 3582(c)(1)(A)(i), a court must consider whether extraordinary and compelling reasons warrant a reduction in sentence, whether Crider poses a danger to the community, and whether a sentence reduction is consistent with the § 3553(a).

Since the Court conducted resentencing under the First Step Act in late 2019, the Court has already recently considered some of these matters. In reducing Crider's sentence so that he had about one year left to serve, the Court concluded that Crider

had matured and no longer posed a danger to the community. Sentencing Transcript, December 16, 2019, R 319, pp. 9-10. The Court intended to impose a sentence which would leave Crider with about one year left to serve in order to facilitate re-entry planning. *Id*.

Defendant maintains two considerations warrant a further sentence reduction, which would not be large, given that his out date is less than eight months away. Given the pandemic, BOP has its hands full and is not yet addressing preparing Crider for re-entry. He is still at the detention center in Milan.

In addition, the Court can take into consideration that Crider suffers from multiple health conditions which the CDC says render him more vulnerable to serious illness or death from COVID-19, which is present at Milan. He has hypertension, type two diabetes, high cholesterol, and at 6' 3" tall and 280 pounds, his BMI is 32, which is obese under CDC guidelines. He takes medications for hypertension, cholesterol, and diabetes. The danger to Defendant's life and health poses extraordinary and compelling reasons for a relatively small reduction in Defendant's sentence.

His re-entry plan is the same as at the time of his resentencing: he intends to move to Arlington, Texas to live with Delano King and his wife and to obtain employment with assistance from Mr. King.

## CONCLUSION

Crider's post offense conduct and rehabilitation while incarcerated has been extraordinary, and clearly shows there is no need for further lengthy incarceration. His institutional record is excellent  He bettered himself and has matured.  He has maintained strong family ties.  He has already received severe punishment.

In addition, he is at significant risk beyond the average for severe health consequences or death from COVID-19.

For all the above reasons, Defendant requests that the Court reduce his sentence under 18 USC 3582(c)(1)(A)(i) to time served, with whatever conditions the Court sees fit for supervised release.

Dated:  July 21, 2020                    /s John Minock  (P24626)
                                         Attorney for Defendant
                                         339 E. Liberty St., Ste. 200
                                         Ann Arbor, Michigan 48104
                                         (734) 668-2200
                                         jminock@cramerminock.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2020, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.

/s John Minock

10